*1095 OPINION.
Van Fossan:
The first and controlling question to be determined in this case is whether or not under the facts as set out above there was a receipt by petitioners in 1920 of the proceeds of the sale. We are of the opinion that there was such receipt. We are led to this conclusion by the clear weight of the evidence, especially that of petitioners’ own witnesses concerning the transaction at the Chase National Bank; by the conduct of petitioners and their representatives during said transaction; by the statements of petitioners in letters addressed to various parties showing that they considered they had received the money; by the fact that the interest and income from the funds have been paid to and received by petitioners; by the fact that, regardless of what their instructions may have been, the only things officially done by the Government agents were to serve notice of assessments, subpoenas, and notices of a statutory lien against the funds, and, by agreement with petitioners, arrange for their safe-keeping; by the fact that the United States has never had possession of the money and has never claimed any right or interest in said funds except as arose from its lien under the statute; and finally by a consideration of the legal effect of the assertion by the United States of a statutory lien for taxes.
The record of the case from which we must sift the material facts is voluminous and conflicting. It is replete with charges by petitioners of illegal conduct and conspiracy on the part of the Government officials and with countercharges by the Government of intended tax evasion by petitioners. These matters are not, however, determinative of the issues here presented. This Board is not the forum for the trial of such questions, however aggrieved the parties may feel. If unlawful processes were employed in the proceedings here under discussion, if the statutory lien was illegally asserted, or if the United States has unlawfully interfered with petitioners’ enjoyment of their property, petitioners might at any time have resorted to the courts for such redress as the law affords them. In any event, the Board has no jurisdiction to grant relief to persons so aggrieved. It has no jurisdiction to inquire into the motives of the Commissioner in making an assessment or into the conduct of his subordinates in levying or enforcing it. We could not relieve of a deficiency otherwise found to be valid even if it were established that the conduct of the Government agents in levying the assessment or their actions in enforcing it were not to be approved. If, in spite of all alleged irregularities, petitioners concluded the sale of their stock and received the proceeds therefrom, they received taxable income.
What, then, is the position of petitioners'? They admit that they sold and delivered the stock; that the money was tendered to them in *1096 payment; that they took it into their hands for counting; that they counted it and found it correct in amount; that they put it in a bag and started to carry it away; that they arranged for its safe-keeping; that the safe deposit box was taken in their names; that they wrote letters (voluntarily) referring to the money as having been received by them; that the money was deposited at their request in the trust company; that they have received all interest and income from the money so deposited; that the money belongs to them and that title is in them. Petitioners admit all of these facts and yet contend they have never “received” the money or come into possession of it. They predicate this position on the facts (as they allege) that while Noble and Scammell were counting the money a notice of assessment and a statutory lien were served on Kerr and Clegg and later a copy of the notice of lien was served on Noble; that as Thomas Clegg started to carry the bag away a Government man also grabbed hold of it; that a Government official stated they had instructions to “ seize and impound ” the money; that a lien notice was served on the safe deposit company and on the box containing the bag; that their letters of September T, 1920, to the trust company were practically dictated by the Government officials; and that they have never been permitted the unrestricted enjoyment and use of the funds.
Even if all of the above alleged facts were admitted, our decision would not be altered. We believe that petitioners received the money, notwithstanding.
A most succinct and conclusive statement of the situation was made by the witness Scammell, one of petitioners’ attorneys, when in reply to the question, “Did you make actual delivery of ¿hem [stock certificates] ? ” he said, “ They had the certificates and we had the money.” Here is the whole transaction in a nutshell. The sale had been made, the certificates had been delivered and the money received in payment. If any doubt remained as to the conclusiveness and completeness of tlieir acts, it would be removed by his further statement, when he says, “ * * * we had finished counting the money and the certificates were on the table and the transaction was completed and at the moment of completion this notice of assessment was served on Mr. Noble * * The conclusion consequent on this statement, “the transaction was completed,” can not be avoided. Mc-Cawley, who served the notice (also called as a witness by petitioners) testified that in reply to his question, “Who is in possession of this money ? ” Noble replied, “ I am.” Two things only were important in the consummation of the sale, — the delivery of the stock to the Holding Company and the receipt by the petitioners of the correct amount of money in payment therefor. When these two events occurred, when their existence coincided in fact, the transaction was *1097 completed and receipt of income was accomplished. No interference by third parties after this event could undo that which had already been done. The notices were not served until the money was in Noble’s possession. The parties had passed the place where either might recall his agreement or retrace his steps. The transaction was completed.
In view of this fact, which is supported by the clear weight of the evidence, the conflict of testimony between Noble and Ellis as to the exact moment of the delivery of the stock and the precise manner of making payment to Kerr and Clegg, which conflict is resolved in the findings of fact, on the bases of the preponderance of the evidence, as well as the preponderance of the probabilities, in favor of Ellis, becomes immaterial.
It is not a little difficult to follow the reasoning employed by petitioners. Their argument is something to this effect: To have “ receipt ” one must get possession; “ to possess is to have absolute power of dealing with the thing oneself and absolute power of excluding the action of everybody else.” Therefore, since the Government agents filed a lien against the money and refused to let Kerr and Clegg walk away with it, since they required that the money be kept intact and properly supervised, it follows that “ * * * Kerr and Clegg did not have the absolute power of dealing with the money and they did not have the absolute power of excluding the action of everybody else and therefore under all the definitions of ‘ possession ’ they did not have possession of the money.” Hence they contend there was no receipt. Obviously, under the conditions laid down by petitioners’ counsel, a man is not in possession of an automobile though he drives it and uses it daily as his own, because under a chattel mortgage he may not sell it or remove it from the State. It is unnecessary to multiply examples of the effect of a contention which would vitiate the effect of all liens and most legal restrictions.
Every case must be judged in the light of its facts and by the character of the particular proceedings. The fact that in certain cases under criminal laws or under ejectment statutes certain interpretations have been given to certain words does not require that here, under a taxing statute, the same interpretation shall govern. The facts in the instant case will readily distinguish it from any of those cited by counsel for petitioners as authority for their position.
The only thing actually done by the Government agents on August 28 was to take such steps as they deemed necessary to perfect the statutory lien on the money paid to Kerr and Clegg and to assure themselves of the preservation of the fund intact. The situation presented many unusual phases. The evidence discloses that Kerr and Thomas Clegg had made reservations for sailing to Europe on *1098 oi' about August 28, 1920, and actually did sail soon thereafter. The Government agents believed the case required effective action. The fact that in the judgment of petitioners these agents exceeded the bounds of their authority or acted with more vigor than petitioners felt was justified presents of itself no basis on which a deficiency may be disapproved, nor does the fact that the United States is not suable in tort confer on this Board any right to question a deficiency on that account.
We have indicated that we are not impressed by this argument of counsel that the petitioners did not receive the money because they have never been permitted the unrestricted possession, enjoyment and use of the funds. Receipt is one thing. Unrestricted possession, enjoyment and use is another and a very different thing. Receipt depends on the consummation of the transaction between the Holding Company and petitioners and not upon subsequent events. The sale was made, the stock was delivered, the money was paid, counted and found correct, the money was placed in the bag. Physical possession being in petitioners, all conditions being satisfied, the sale was completed and receipt was legally accomplished.
Nor is it material that possession may have been interfered with. Possession is a fact. It either exists or it does not. Once it exists the length of the unrestricted enjoyment is immaterial. If possession was had by petitioners, it matters not how many liens may have been asserted, or by whom.
Assuming for the moment that, as Noble asserted, at the time the Government served the notices of lien on him the money had not been placed in the bag; how does this alter the situation? He admits that after a conference they placed the money in the bag and that Thomas Clegg started to walk away with it. He also states that thereafter he delivered the certificates of stock to the Holding Company. By this course of action they waived any right they might have had to claim that the transaction had been interrupted before completion. They elected to go ahead with it and the transaction was completed. Even under such facts, which are those most favorable to petitioners, petitioners received the money.
Petitioners admit that payment was made by the Holding Company and that the stock was delivered to it. By inference they admit that they have now no right of action against the Holding Company for the price of the stock or its recovery. They even admit that the money in question “belongs to them.” How, then, was ownership transferred? When the money passed from the hands of the Holding Company, to whom did it pass? Who received it? Obviously not the Chase National Bank, from whom it originally came; not the United States, for it was neither tendered *1099 to, received by, touched nor claimed by the United States. The money was not abandoned; possession must have been in somebody. Tender and delivery were made to Kerr and Clegg. Noble then took the money in his hands. From the moment it left the possession of the Holding Company it has never been out of the hands of petitioners or their agents. Facts are the most complete answer to any theory. The conclusion from the facts in this case seems inescapable. Petitioners had legal possession and with legal possession went receipt.
Petitioners place great emphasis on the alleged “ seizing and impounding ” of the fund by the Government. But when the alleged seizing occurred, the property belonged to petitioners (this they admit), Noble had possession, “the transaction was completed the seizing and impounding, therefore, if such occurred, were from the possession of petitioners, of property which belonged to them, after the completion of the sale and payment. Assuming that there was a seizing and'impounding, which in our opinion is not proved, such action would merely take the parties as it found them and would create no new rights between them. It had no retroactive effect. It would not void the sale or render it incomplete. The placing of a statutory lien against property is an every-day occurrence. To hold that such an action prevented the receipt of income would defeat the very purpose of the law in aid of which the statutory lien was created.
When we pass from the transaction of August 28, 1920, to the subsequent events we find ample corroboration of the conclusion announced above that petitioners received the money in fact and in law.
On August 81,1920, while the details of the matter were still very fresh in mind, petitioners on their own motion and without the knowledge or suggestion of the Government wrote to Priest in the office of the Solicitor, stating that it was their “ desire to devote the proceeds received on the 88th instant ” to the acquisition of steamers under American registry. They repeated the admission in a later paragraph of the same letter, referring to the “ fimds received by us.” On September 15, 1920, again on their own motion, they wrote the Shipping Board, each petitioner referring to the funds received by his associate, as being “ received by him ”/ and on October 13, 1920, they each wrote the Commissioner and the Collector of Internal Revenue (surely the last persons to whom an admission of receipt of income would be made if it were not a fact), reaffirming all statements made in the Shipping Board letters, and again each referred to the funds his associate had “ received as the gross proceeds of the sale of his interest in the ten ships above mentioned.” The explana *1100 tion of counsel for petitioners that what petitioners meant was that “ the money belonged to them ” and that they were “ entitled to receive ” it is neither convincing nor is it supported by the evidence.
The above letters are not included in those which petitioners claim were written under duress. Their statements stand out as clear and distinct admissions of receipt. They can not lightly be explained away. Indeed, they need no explanation. They speak for themselves and prove beyond a doubt that petitioners considered that they had received the money. Even the charge of duress as to the letters of September 7,1920, is entirely answered and disproven by petitioners’ later statements in the Shipping Board letters, when, of his own election, each states “on September 7, 1920, I placed the gross proceeds ($2,456,859.80) arising from the sale of my interest * * * m the Empire Trust Company * *
There is a further fact which we deem important as corroborative of receipt. Petitioners have at all times received the income from the funds in the Empire Trust Co. Although there are situations where income may go to one party while ownership and possession are in another, income is not casually paid to one not entitled to receive it. If petitioners never received the money and never came into possession of it, certainly they were not entitled to the income from the funds on deposit. It is difficult to reconcile with reason the position of petitioners by which they admit the presence of all of the facts and elements usually demonstrative of receipt but deny the conclusion consequent from these facts.
In view of our conclusion that petitioners came into actual receipt of the money at the time of the sale on August 28, 1920, it becomes unnecessary to consider the question of constructive receipt.
Our discussion has perhaps already sufficiently indicated that in our opinion petitioners have relied on a misconception of the purpose and a misunderstanding of the effect of a statutory lien for taxes. Such a lien is not an assertion of title nor does it depend on possession. It is merely a form of security and an extraordinary remedy afforded the United States in aid of its tax laws. The statute says that under certain circumstances unpaid taxes “ shall be a lien in favor of the United States ” upon “ all property and rights of property” of the taxpayer. The filing of such a lien is notice that the United States has an unpaid tax claim and its perfection gives the United States a certain preference in payment. The limitation on the control, enjoyment and use of the property that follows the filing of the lien is merely the intended consequence of the law. The compulsion resulting from this limitation and the possibility of the sale of the property to satisfy the lien are the legal *1101 bases on which the effectiveness of the lien rests. Be it always remembered that the lien which was here asserted was a statutory proceeding authorized by Federal law. The lien has never been declared invalid or illegal by any court. If petitioners received the money the lien attached; if they did not the lien was futile gesture. Though the lien depended for effectiveness on receipt of the money by petitioners, receipt was in nowise controlled or affected by the lien.
There remains to consider only whether or not the deficiencies in that case are subject to a penalty of 5 per centum and interest at the rate of 1 per centum per month as provided by section 250 (e) of the Revenue Act of 1921.
Before a taxpayer becomes liable to the above penalty and interest charge, the terms of the Act imposing it must be strictly complied with. A legal demand must be made. The assessment of August 27, 1920, has been abated and is therefore disposed of. The assessment of February 12, 1924, was made while an appeal was pending with the Commissioner and before granting the hearing provided by section 250 (d) of the Act. Since no proper legal demand could be predicated on such an assessment, we are of the opinion that the deficiencies are not subject to the above penalty and interest.
The determination of the Commissioner as to the deficiencies is approved.
Judgment will be entered after 15 days' notice, wider Rule 50.
Artotoell and Milliken not participating.